I think your best bet is from the podium at the table in light of this contraption that's blocking the podium up here. When you're ready, you may proceed. Thank you, Your Honor. Good afternoon, Your Honors. May it please the Court, Artemis Vamianakis, on behalf of Petitioner KenAmerican Resources. I'm here with my co-counsel, Jason Hardin, and I would like to reserve two minutes for rebuttal. Could you make a conscious effort to keep your voice up because you're far away? Yes, Your Honor. I will speak into the mic as well. Your Honors, this appeal concerns a citation issued under Section 103 of the Mine Act to KenAmerican Resources at the Paradise No. 9 mine, and specifically a citation issued for an alleged violation of the prohibition against providing advance notice of an inspection. This case was issued in 2012, Your Honors, and it has taken a long time to get to you, but it raises important issues and questions before this Court, including the correct statutory interpretation of Section 103A's prohibition against advance notice, including who it applies to, what is required to prove that violation, and ultimately what communication is allowed or prohibited at a mine when MSHA sets foot on mine property. Your Honors, KenAmerican Resources makes four arguments that raise three main points. Number one, that Section 103A, the prohibition against advance notice of an inspection, applies only to the secretary and not to operators. Number two, that if it is applied against operators, as was applied in this case, it plainly requires proof of advance notice of an inspection, and not merely advance notice that MSHA is on mine property. And relatedly, as applied in this instance, there was not substantial evidence that the communication provided advance notice of an inspection. The facts in this case and before this Court are largely undisputed, but I'd like to highlight a few of them as they help narrow in and focus in on the substantial evidence issues and also on the statutory interpretation issues and highlight why it's difficult to actually apply this provision to mine operators, as was done here. So this citation was issued on April 20, 2012, alleging a violation of Section 103A. And specifically, the citation states in Section 8 that mine personnel provided advance notice to miners underground that MSHA inspectors were on mine property. But what had happened there was the day before, MSHA had received a hazard complaint and they sent an inspector, actually there were six inspectors total, the following day to the Paradise No. 9 mine to investigate that hazard complaint. Now the Paradise No. 9 mine is a large mine. To give you some reference for the scope of this mine, it had four operating units. Each of those operating units had two large continuous miners working there. Each of those units had four shuttle cars, a scoop, a feeder, roof bolting machines, power centers. And it would take about 20 to 40 minutes for someone to drive from the mine portal down to the unit where they were working. And it was about 4.7 miles from the unit portal to certain places at the mine. And approximately there was about three to five miles worth of belt lines at this mine. No doubt a large mine. The MSHA inspectors arrived that day at 5.10, which was two hours after the shift change. So miners were already underground and as you can imagine, it took some time to get there. Four inspectors, including the issuing inspector, went to the new portal and two others stayed behind at the old portal in the shack where the dispatcher was. Now when inspections are occurring, MSHA inspectors, they need escorts and rides in order to get down to the areas of the mine where they're going to be inspecting. But when MSHA inspectors arrived mid-shift, as was here, it can create some complication and some awkwardness. Because it necessitates that the person who is coordinating the rides, the dispatcher, has to call down and have somebody come meet them. Lance Holtz, the inspector there, was working on the phones that day and trying to coordinate rides for the six MSHA inspectors. The subject communication occurred when Inspector Sparks was monitoring the phone communication line. And he overheard someone from the number four unit, so someone underground, call up to the dispatch. Dispatch answers and someone from the number four unit said, do we have any company outside? Now what Mr. Holtz responded at the trial was disputed, but for the purposes of this appeal, it is not. Inspector Sparks testified that he replied, yeah, I think there is. So we have, do we have any company outside, to which the dispatcher replied, yeah, I think there is. Presumably this was in response to the request for escort and trips? Yes, Your Honor. On the one hand, any reason that you would do that unless there was somebody coming down that is, quote, company outside? Yes, Your Honor. The testimony was that the dispatcher Holtz had been calling down actively to look for rides. And once you do that, is there any, would the company likely to be anybody other than MSHA unless it was, you know, like big bosses from Chicago or something? Certainly. And, you know, it could have been corporate safety personnel. But, you know, the testimony. They come very rarely and MSHA comes all the time, don't they? That is correct, Your Honor. And the testimony revealed that the dispatcher inferred that company meant MSHA, especially since he had been calling down to get those rides. So as soon as the communication was overheard, the issuing inspector issues the citation, advance notice. He did not go and speak to the dispatcher to find out, hey, what did you mean, do you know who you talked to, anything like that? The dispatcher testified that he did not intend to provide advance notice, nor did he think that he was doing so because it was a vague communication that was made in the context of providing escorts and rides. And importantly, the dispatcher had no knowledge of exactly what MSHA was there to do that day. No one had shared the hazard complaint with him, which, you know, the hazard complaint lists here the seven problems and the seven areas that we're going to inspect. What's the purpose of asking the question? The question of do we have any company outside? That's a good question, Your Honor, and I'm assuming within the context of rides, it could be do we need to escort someone. It's unclear to me, you know, unclear based on the testimony whether when he called down, as I understand it, he called down and nobody responded, you know, that takes them a second to pick up, and then someone picks up the phone, it's almost like, yeah, what did you need? Do we have company outside? Is there someone that we need to provide an escort to? The first, you know, is this the first response to the request for maintenance? I thought that it was indicated he had made some requests and gotten some response earlier. Am I wrong? I believe that you're correct, Your Honor, but I'm not completely certain. I don't know if this was the first request to that particular person, because he was looking for escorts and rides for six people, so I'm not sure if that... As I understand the system, he's not really, it goes out on an all call. He may have wanted to talk to somebody at number four, but I thought everybody heard him. I thought there's a description of the phone system, only when somebody picks up that he knows who's picked up, is that right? That is correct. It's not like he dials Joe Blow at number four. I believe that's correct, but I think he has the capability of dialing Joe Blow at number four. That's not what he did, is my understanding, again, from the records so far. Yeah, that is my understanding as well, Your Honor. Why aren't these factual questions? I mean, you can testify, well, I was just trying to find out whether they still needed a car, or do I need to escort somebody or whatever, and then, well, I didn't think he was asking this, but ultimately someone's going to make a credibility determination. There was a credibility determination made at trial, Your Honor, but we think it goes beyond that, because the commission found that what was said in response was dispositive, that the, yeah, I think there is, was dispositive. We would argue, Your Honors, that it doesn't matter. If he had said, I don't know, or, yeah, I think that there is, that is not sufficient to prove advance notice of an inspection pursuant to Section 103A of the Mine Act, that more is required. There are legal questions in terms of the statutory interpretation of that. Your Honor, from your point of view, did the commission flatly say that notice of presence is the same as notice of inspection? And if so, did they rely on any previous regulation or manual to make that finding, make that holding? Yes, Your Honor. In my impression, what the commission did was find, they overturned the credibility determination, found that the dispatch said, yeah, I think there is, and that was sufficient. So to us, that effectively is saying that it is sufficient to acknowledge that MSHA is on mine property. And they did not, I do not believe, Your Honor, that they referred to and relied on a particular case or policy because at least some of the argument on some of these points has to do with Chevron deference. And I'm trying to see your point of view, if there is anything to defer to. We'll let you hear from your adversary at that point. I'm sorry, go ahead. Yes, Your Honor. Not based on what the commission decided. Ultimately, this comes down to a question of statutory interpretation. And we would argue that the section actually applies only to the Secretary of Labor based on the way the statute is framed. Do I understand your Chevron argument correctly that you're saying Chevron fails at the first step? The statute is not ambiguous. Yes, Your Honor. And you're not attacking any other portions. We are arguing in two, we are arguing the two steps. Number one, that it fails, that we don't have to get to Chevron step two because it unambiguously either, number one, applies only to the Secretary because of the language that states, in carrying out the requirements of this subsection, no advance notice of an inspection shall be required. We're arguing that that is plain and unambiguous and you do not need to defer to the Secretary's interpretation. But we're also alternatively arguing if the court does reach the interpretation of the Secretary, that it is also an unreasonable interpretation based on, for several reasons cited in our briefs, Your Honor. Let me ask you, separate and apart from those two reasons, why would Chevron deference be appropriate in any event in that perhaps we would think that, or decide that there's no special agency expertise that's needed to address the matter at issue? If there's no specialized industry or other expert agency expertise that's needed or can shed light, why would Chevron deference be appropriate in any event? I don't know or nobody's explained why there's something going on here that we need specialized commentary or agency expertise to resolve. If there is, I'm not sure what that is. What do you say to that? Your Honor, I would agree with you. I'm not sure that there is a need to go to Chevron deference. The statute itself can be interpreted by this court by its plain language and there's no particularized knowledge that the agency can provide to shed light on that for the court. I see I'm out of time, Your Honors. Thank you. Thank you. Thank you. We'll hear from opposing counsel at this point if technology permits. Good afternoon, Your Honors. Can everyone hear me? Yes. Yes. Thank you, and may it please the court, Emily Tolerstadt for the Secretary. This case comes down to a simple but a crucial point, which is that the Mine Act depends on unannounced inspections. If mine operators know that NSHA is coming to inspect a mine or at a mine to inspect it, then mine operators have the opportunity to either fix hazards and violations. If mine operators can hide and fix hazards and violations, then NSHA inspectors are able to see or inspect mines as they're actually operating. And if NSHA can inspect mines as they're actually operating, then NSHA can enforce the mine act. Can Americans argue that in this case would blow a hole through the center of NSHA's enforcement of the Mine Act, certainly disastrous implications for that enforcement, and likely disastrous implications for miners' safety and health? Counsel, that may be true as to some of their arguments. But my question would be with respect to, for example, particularly, is notice of presence the same as notice of an inspection? That is to say, when you have the circumstances that you're going to have to call for man trips or some type of transportation underground, you're going to have to have some communication. And shouldn't it, query, shouldn't it be somewhat more nuanced as to whether any notice that NSHA is there, particularly at something like Paradise Number 9 as opposed to a one-man dog hole, shouldn't you need something more connecting it to an inspection? That's my, I mean, I say they have four points, and some of them I agree with you on that. But as to what kind of notice you have to be giving, could you address that? Well, I think I have a few points in response. So the first is that, yes, there is a difference between giving notice that NSHA is at mine property and giving advance notice of an inspection. So it is not the Secretary's position that the statute prohibits giving notice that NSHA is on mine property. The Secretary's position is that the statute prohibits giving notice that NSHA is on mine property if NSHA is there to conduct an inspection, because under that circumstance... And just to stop you there, regardless of what the people are saying and doing, because you just said it's a violation if they're there to do an inspection as opposed to if they're not, right? And I thought I heard you say that you have committed the violation if they're there to do an inspection, even if you did exactly the same things and they were there to do an investigation. I may have spoken a little too broadly there. Whether there has been a violation depends on all the facts and circumstances of the case. So I do agree, Your Honor, that simply... Well, it would be extremely fact-specific. So whether any given communication constitutes advance notice is, you know, going to depend very much on the precise circumstances of that communication. But it is not the Secretary's position that an operator can never say NSHA is out of mine. It is the Secretary's position, though, that when NSHA is there to conduct an inspection, you know, whatever conduct has the effect of giving advance notice that NSHA is at the mine to do so is prohibited. Well, the problem, I mean, there's this consequential theory that you only look at the consequence regardless of the intent, which I think is somewhat problematic. So they show up to do an inspection and you have to ask for, what is it, a man-trip, a man-car, whatever? So just doing that could tip people off, right? And if you say that the question is, did what the dispatcher do provide notice of what turned out to be an inspection, then almost anything can provide notice. Are you following me? I am following you. Simply calling for the car can provide notice. Right. So the Mine Act doesn't prohibit driving inferences. And I do understand your point that, you know, under some circumstances, simply the act of calling for a ride in an escort might provide advance notice. But it wouldn't always. And, you know, I think also understanding the way, understanding the Mine Act here helps, too. So the Mine Act is a strict liability statute that prohibits liability without call for violations. So even, you know, if you have an outlier of a case where there truly was an innocent communication, but it did happen to provide advance notice and it happened to be cited, you know, the interest penalty structure certainly takes that into account. I understand the penalty in this case was quite high, but that's because this violation was pretty severe. You know, many violations, including the one attached to our brief, are issued penalties much lower than $100, $200. They reflect, you know, the culpability of the operator. It takes into account the operator's negligence. Although I guess I can ask the opposing counsel as well on rebuttal. $18,000 isn't a lot of money really for the government or for the people that own Paradise Mine. Are both of you really fighting over principle? That is, have you tried to settle this $18,000 case, or would you like to? Or are one or both of you really trying to get us to come down hard on a principle? Well, I obviously can't make any representations for an American's position on this point. I will say that, you know, the Secretary's interest in issuing a citation in the first place is, well, one, simply enforcing the Mine Act, because that's what the Secretary is required to do. But also, you know, at least with respect to some of the broader points that have been made here, this case really does raise serious questions about the core of the Secretary's ability to enforce this statute. And so, you know, to the extent that your question is about, you know, does this case involve principles, certainly for the Secretary, it involves very important principles. I don't think that, you know, I at least did not have any settlement discussions, so I'll answer your question pretty simply on that point, which we've got to know. But, you know, the broader points, they are significant. And so, you know. Has this ever been challenged before, that the statute applies to mine operators? Not that I am aware of. I mean, I can't say whether it has ever been raised, you know, before at ALJ. There are tens of thousands of these citations issued. Well, not for advance notice, but there are many, many citations issued each year that are contested, so I can't speak for whether it's ever happened. I will say it's never been, you know, raised on appeal to the Commission before and never been raised to important appeals before. If I could take you back to the point about we were discussing, you might say, the correct legal principle about presence versus an inspection. Do you read what the Commission did to make a ruling on that? I particularly, you know, point to the part on your page six. There are so many pages, but it's page six of 42 MSHRC. Holtz thought the caller was asking whether they were on site, and Holtz's statement informed him they were, and at that point the violation occurred. I mean, that sounds like it's notice of presence, that the Commission is holding the notice of presence. Do they cite a, you know, is there a reg or a policy manual or something that makes that leap? I don't think there is. You know, I certainly, I can't again speak for exactly what the Commission was doing, but it's not how the Secretary interprets that part of the decision. I think instead of focusing simply on that one sentence or two sentences in isolation, I think the better way to read the Commission's decision is to read it in context. And in context, I think it's clear that what the Commission was focusing on is, in fact, advance notice of an inspection, not simply that InSHA was on site. I will grant you that that language is perhaps imprecise, but, you know, it was not our position before the Commission that 103A prohibits advance notice that InSHA is on site. I mean, would, since this, I mean, the ALJ had two hearings here, and in a sense, wouldn't it be better or perhaps remanded to say, there should be a remand to explicitly make findings on that question? That is, did these actions convey advance notice of an inspection, if, as you say, if, as you sort of imply, the Secretary's position really is that it must be advance notice of an inspection? And I didn't read the ALJ's decision as making a conclusion on that. Did I misread the ALJ's decision? I'm not sure that I follow. I will say, I think, what's actually on review before the Court at this point, in fact, the Commission's decision, since that is. Okay, but then the Commission did query, should I read that as saying that the Commission made a factual finding that there was notice of an inspection rather than notice of presence? I do think that is the way to read the Commission's decision. And again, I think rather than those two sentences focusing on the Commission's core factual findings, I'll have to, I believe our brief notice piece, but the core factual findings that the Commission made were that MSHA was at this line in order to conduct an inspection, that the caller on the ground called out and said, do we have any company outside? Crucially, that the caller meant MSHA, that the dispatcher knew the caller meant MSHA. And the dispatcher said, yeah, I think we do. But again, MSHA, see, I was almost with you if you made the leap that, and therefore it was for an inspection, because when you stopped at MSHA, which is what you just said, that puts us back to the first principle. And at that point, for example, your footnote 11, or the Commission's footnote 11, kind of indicates how nuanced or fact-intensive these might be. I do agree that they're very nuanced, and I apologize that I spoke somewhat less inferiorly. I think the crucial point is not just that the caller meant, or not just that the caller meant MSHA here and that the dispatcher knew that they meant MSHA. What's critical to understand, too, is that the dispatcher was not alone. You know, in the shack. Instead, with him were two, I believe it was two, but at least one MSHA inspector who specifically said, we are here to conduct an inspection, don't provide advance notice. So it is clear that the dispatcher knew that the caller meant MSHA here, he knew that MSHA was there to conduct an inspection, and he responded, yeah, I think there is. I'm sort of, just since you mentioned that, am I right that anybody where Holtz was did not testify? Sparks was over at the other portal four miles away listening on the audio system. I just sort of wondered why we didn't hear from the ones who were right there with Holtz. I do not have an answer for that, Your Honor. I apologize. It's not your fault. Was that part of the evidence? That Holtz was instructed not to provide advance notice? Yes. That is in the transcript. I apologize, I don't have a citation in front of me. I didn't think it was from that guy, I thought it was from somebody else, but I could be wrong about that. So we don't, I mean, it seems to me to be sort of a stretch. Some of the positions of the commission that, I understand part of your argument to be that if there is, if they are there for the purpose of inspection, then it's strict liability. If somehow you give notice, then you've committed a violation. And it really doesn't matter what your intent was, and it really doesn't matter whether you knew that they were there for an inspection. I mean, I hear that as being the commission's position. Is that wrong or is that right? I think that is the commission's interpretation as well, and I think that's the bottom of page 5 to the top of page 6 of the commission's decision. Focusing, or stating proof of intent is not required and that the purpose of the audit is that. But we don't really have to accept that, right? Because here, there's evidence that the dispatcher knew that they were there for the purpose of performing an inspection and knew as well that that's what he was being asked. So to affirm the commission's finding a violation in this case, I think that's correct. It would not be necessary to reach the question of whether intent is required. It would be unusual, though, to require proof of intent to establish a violation of the Mine Act because, again, it's a strict liability statute and intent is generally not required with the exception of... I see I'm out of time. May I finish my slide? Sure, go ahead. So there are some provisions that impose individual liability for willful or knowing violations of the Act. But outside of those, intent generally is not required. So again, the short answer is to affirm this particular violation, no, the court doesn't need to accept that the finding of intent is not required. But more generally, I do think it's correct that the finding of intent is not required to establish a violation. But with respect to the question of whether notice of presence is the same as notice of an inspection, that language is the same or that issue is the same in the criminal statute as well, isn't it? That is, Holtz, if the prosecutors had chosen, could have been criminally prosecuted for providing, quote, advance notice if it meant notice of presence. But wouldn't, it is not, you know, the Secretary's call obviously whether to criminally prosecute because the Secretary doesn't prosecute the criminal violations. I do think that, you know, it's certainly possible it could have been referred, whether it could have been proven to the standards required to, you know, make out a criminal violation. I don't, and I hesitate to speculate about it. But I do think that, yeah, there is a difference between what's required to establish a violation, something that was made wrong, and a civil violation as here. Do you have any insight or thoughts about why the statute is phrased so strangely when the criminal corollary is very clear that it applies to anybody? Like, why is it written this way? I asked myself that question about many versions of the Mine Act. But I think that the statute, whatever Congress's reasons for writing it this way, you know, I think we need some textual arguments. And one of them is that, you know, the use of the passive voice here is deliberate because it doesn't specify an actor. And especially when compared with the other parts of this subsection, of subsection A, that do use a pattern saying the Secretary shall do this, the Secretary shall do that. It is significant that Congress did use the phrasing that is, admittedly, somewhat awkward. But it's different. And it's significantly different because it's not limited to the Secretary. And I will also just note that, you know, Congress is very concerned with the problems of advance notice, or with limiting advance notice because of the opportunities that it creates. And so, you know, I think the only sensible interpretation that reconciles the evil that Congress was trying to prohibit with the way Congress went about prohibiting it is that it has to apply to operatives. All right. Thank you very much. And we'll have rebuttal. Thank you, Your Honors. Thank you, Your Honors. Can you hear me? Yes. A few points on rebuttal. First, the Secretary mentioned, Counsel for the Secretary mentioned the concern that taking away the ability of the Secretary to cite operators for advance notice under Section 103 would just blow a hole through the enforcement scheme. But there's no, there's certainly no parade of horribles that will ensue. Indeed, it's only MSHA and only the MSHA inspectors that ever truly know the details of any inspection. It's only MSHA that knows when they show up that day what they're going to inspect, where they will be going, and who they're going to be talking to. So usually if there's — They'd already told Mr. Kapp those things, hadn't they? They had told Mr. Kapp, Your Honor, but there's no evidence that Mr. Kapp told anyone else. Mr. Kapp certainly did not tell the dispatch, and Mr. Kapp did not call down underground to say, hey, MSHA's here, here's all the places that they're going. That is not this case. That is not what happened here. Indeed, there's no evidence that the dispatcher, Holtz, who had this subject communication, knew any of the details behind where the inspectors were going, what they were going to inspect that day. So Inspector Holtz essentially could not have given advance notice of the particulars of the inspection going on that day. And in terms of, Judge Boggs, your question about the commission decision and MSHA presence at a mine versus an MSHA inspection, I read the commission decision, Your Honor, as sort of jumping to a conclusion that whereas Holtz inferred that MSHA meant company, the commission took it one step further and said that Holtz inferred that MSHA, that company meant MSHA inspectors. But I don't think the facts bear that out in particular. And that's an important point because MSHA could be at a mine for many different reasons as articulated. With respect to the question of who told whom not to provide notice, of course the regs say don't provide notice of an inspection. The statute does. Everybody's supposed to know that. Is there something in your understanding of the record specifically about who told whom, you know, we're here to do an inspection, don't tell anybody? Based on my recollection of the record, Your Honor, the two inspectors when they arrived at the shack where the dispatcher was, they informed Mr. Holtz that the inspector, an inspector would be monitoring the phone communications and warned him not to provide advance notice. And that is the extent of the warning based on my recollection. That testimony is in the record somewhere? Yes, Your Honor. Now, they didn't go further to provide any further details. We can look it up. Thank you. Thank you, Your Honor. Thank you very much. I guess you're out of time there. And the case may be submitted. There being no further cases for argument today, court may be adjourned.